## ROMANO *v.* OKLAHOMA

No. 92–9093.   Argued March 22, 1994—Decided June 13, 1994

2

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CON-NOR, SCALIA, KENNEDY, and THOMAS, JJ., joined. O'CONNOR, J., filed a concurring opinion, *post*, p. 14. BLACKMUN, J., filed a dissenting opinion, *post*, p. 15. GINSBURG, J., filed a dissenting opinion, in which BLACKMUN, STEVENS, and SOUTER, JJ., joined, *post*, p. 15.

*Lee Ann Jones Peters* argued the cause for petitioner. With her on the briefs was *Robert A. Ravitz.*

*A. Diane Blalock,* Assistant Attorney General of Oklahoma, argued the cause for respondent. With her on the brief was *Sandra D. Howard,* Assistant Attorney General.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner murdered and robbed Roger Sarfaty in 1985. In 1986, he murdered and robbed Lloyd Thompson. Petitioner was tried separately for each murder. The Thompson trial occurred first, and an Oklahoma jury found petitioner guilty and sentenced him to death. Petitioner was then tried for the Sarfaty murder. A different Oklahoma jury found him guilty and sentenced him to death. During the sentencing phase of the Sarfaty trial, the State introduced a copy of the judgment and sentence petitioner received for the Thompson murder. Petitioner contends that the admission of evidence regarding his prior death sentence undermined the Sarfaty jury's sense of responsibility for determining the appropriateness of the death penalty, in violation of the Eighth and Fourteenth Amendments. We disagree and hold that the admission of this evidence did not amount to constitutional error.

In Oklahoma, capital trials are bifurcated into guilt and sentencing phases. Okla. Stat., Tit. 21, § 701.10 (1981). The

---

*A brief of *amici curiae* urging affirmance was filed for the State of Ohio et al. by *Lee Fisher,* Attorney General of Ohio, *Richard A. Cordray,* State Solicitor, *Simon B. Karas,* Deputy Chief Counsel, and *Cordelia A. Glenn* and *Mary L. Hollern,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Winston Bryant* of Arkansas, *Richard Blumenthal* of Connecticut, *Charles M. Oberly III* of Delaware, *Pamela Carter* of Indiana, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Don Stenberg* of Nebraska, *Ernest D. Preate, Jr.,* of Pennsylvania, *T. Travis Medlock* of South Carolina, and *Stephen D. Rosenthal* of Virginia.

4

sentencing jury may not impose a death sentence unless it unanimously finds the existence of at least one statutory aggravating circumstance beyond a reasonable doubt, and that any aggravating circumstances outweigh any mitigating circumstances. § 701.12. At the sentencing phase of the Sarfaty trial, the State sought to prove four aggravating circumstances, two of which are relevant to our decision: (1) that petitioner had been previously convicted of a violent felony; and (2) that petitioner would constitute a continuing threat to society.[1]

In attempting to establish these two aggravating circumstances, the State introduced evidence relating to the Thompson murder. The State presented testimony by Thompson's neighbor concerning her observations the day of the murder, Thompson's autopsy report, and photographs and fingerprints showing that the defendant in the Thompson case was in fact petitioner. The State also introduced a copy of the judgment and sentence from the Thompson murder conviction. That document revealed that petitioner had been convicted of first-degree murder and had been sentenced to death. App. 5–6. It also showed, and the trial court told the jury, that petitioner planned on appealing from the judgment and sentence. *Id.*, at 7. Petitioner's counsel objected to the admission of the document. He argued that, regardless of the admissibility of the evidence of petitioner's conviction, the death sentence petitioner received was not proper for the jury to consider. The trial court overruled the objection and admitted the evidence. Petitioner later presented evidence in mitigation.

Before closing arguments, the trial court instructed the jury. It identified the four aggravating circumstances the State sought to establish and told the jury that "[i]n determining which sentence you may impose in this case, you may

---

[1] The other two aggravating circumstances were that the murder was especially heinous, atrocious, and cruel, and that it was committed to avoid lawful arrest or prosecution.

consider only those [four] circumstances." *Id.*, at 9.  The court then identified the 17 mitigating circumstances offered by petitioner.  The jury was instructed that it could not impose the death penalty unless it unanimously found that one or more aggravating circumstances existed beyond a reasonable doubt and that any such circumstances outweighed any mitigating circumstances.  *Id.*, at 8–12.  In closing, the court admonished the jury:

> "You are the determiner of the facts.  The importance and worth of the evidence is for you to decide.
>
> "I have made rulings during the second part of this trial.  In ruling, I have not in any way suggested to you, nor intimidated [sic] in any way, what you should decide.  I do not express any opinion whether or not aggravating circumstances or mitigating circumstances did or did not exist, nor do I suggest to you in any way the punishment to be imposed by you.
>
> "You must not use any kind of chance in reaching a verdict, but you must rest it on the belief of each of you who agrees with it."  *Id.*, at 13.

The jury found that all four aggravating circumstances existed and that they outweighed the mitigating circumstances.  It accordingly imposed a death sentence.  Petitioner appealed.  While his appeal in this case was pending, the Oklahoma Court of Criminal Appeals overturned petitioner's conviction for the Thompson murder.  See *Romano* v. *Oklahoma*, 827 P. 2d 1335 (1992) *(Romano I)*.  The Oklahoma Court of Criminal Appeals held that petitioner's trial should have been severed from that of his codefendant; it therefore reversed and remanded for a new trial.[2]

In his appeal in this case, petitioner argued, *inter alia*, that the trial court erred by admitting evidence of his conviction and sentence for the Thompson murder.  He asserted

---

[2] On retrial for the Thompson murder, petitioner was again convicted and again sentenced to death.  Brief for Petitioner 31, n. 11.

that it was improper to admit the conviction because it was not final at the time of admission, and it had since been overturned. He also contended that the evidence of his death sentence in the Thompson case impermissibly reduced the Sarfaty sentencing jury's sense of responsibility for its decision, in violation of *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985).

The Oklahoma Court of Criminal Appeals affirmed. 847 P. 2d 368, 390 (1993) *(Romano II)*. The Oklahoma court concluded that the evidence regarding petitioner's prior death sentence was irrelevant. Because the jury was properly instructed in this case, however, it could not be said "that the jury in any way shifted the responsibility for their decision or considered their decision any less significant than they would otherwise." *Ibid.* The Court of Criminal Appeals further held that the admission of the evidence "did not so infect the sentencing determination with unfairness as to make the determination to impose the death penalty a denial of due process." *Id.*, at 391.

Petitioner sought our review, and we granted certiorari, limited to the following question: "Does admission of evidence that a capital defendant already has been sentenced to death in another case impermissibly undermine the sentencing jury's sense of responsibility for determining the appropriateness of the defendant's death, in violation of the Eighth and Fourteenth Amendments?" 510 U. S. 943 (1993). We now affirm.

It is helpful to begin by placing petitioner's challenge within the larger context of our Eighth Amendment death penalty jurisprudence. We have held that the Eighth Amendment's concern that the death penalty be both appropriate and not randomly imposed requires the States to perform two somewhat contradictory tasks in order to impose the death penalty.

First, States must properly establish a threshold below which the penalty cannot be imposed. *McCleskey* v. *Kemp*,

481 U. S. 279, 305 (1987). To ensure that this threshold is met, the "State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold." *Ibid.* As we stated in *Lowenfield* v. *Phelps,* 484 U. S. 231 (1988), "[t]o pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Id.,* at 244 (quoting *Zant* v. *Stephens,* 462 U. S. 862, 877 (1983)). In this respect, a State's sentencing procedure must suitably direct and limit the decisionmaker's discretion "'so as to minimize the risk of wholly arbitrary and capricious action.'" *Id.,* at 874 (quoting *Gregg* v. *Georgia,* 428 U. S. 153, 189 (1976)). Petitioner does not allege that Oklahoma's sentencing scheme fails to adequately perform the requisite narrowing.

Second, States must ensure that "capital sentencing decisions rest on [an] individualized inquiry," under which the "character and record of the individual offender and the circumstances of the particular offense" are considered. *McCleskey, supra,* at 303 (internal quotation marks omitted); see also *Clemons* v. *Mississippi,* 494 U. S. 738, 748 (1990). To this end, "States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant." *McCleskey, supra,* at 306.

Within these constitutional limits, "the States enjoy their traditional latitude to prescribe the method by which those who commit murder shall be punished." *Blystone* v. *Pennsylvania,* 494 U. S. 299, 309 (1990). This latitude extends to evidentiary rules at sentencing proceedings. See, *e. g., Gregg, supra,* at 203–204 (approving "the wide scope of evidence and argument allowed at presentence hearings"

8

in Georgia).  As we observed in *California* v. *Ramos*, 463 U. S. 992, 999 (1983):

> "In ensuring that the death penalty is not meted out arbitrarily or capriciously, the Court's principal concern has been more with the *procedure* by which the State imposes the death sentence than with the substantive factors the State lays before the jury as a basis for imposing death, once it has been determined that the defendant falls within the category of persons eligible for the death penalty."

See also *id.*, at 1008 ("Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment").

We have also held, in *Caldwell* v. *Mississippi*, that the jury must not be misled regarding the role it plays in the sentencing decision.  See 472 U. S., at 336 (plurality opinion); *id.*, at 341–342 (O'CONNOR, J., concurring in part and concurring in judgment).  The prosecutor in *Caldwell*, in remarks which "were quite focused, unambiguous, and strong," misled the jury to believe that the responsibility for sentencing the defendant lay elsewhere.  *Id.*, at 340.  The trial judge "not only failed to correct the prosecutor's remarks, but in fact openly agreed with them."  *Id.*, at 339.

The plurality concluded that the prosecutor's remarks, along with the trial judge's affirmation, impermissibly "minimize[d] the jury's sense of responsibility for determining the appropriateness of death."  *Id.*, at 341.  Such a diminution, the plurality felt, precluded the jury from properly performing its responsibility to make an individualized determination of the appropriateness of the death penalty.  *Id.*, at 330–331.  JUSTICE O'CONNOR, in her opinion concurring in part and concurring in the judgment, identified more narrowly the infirmity in the prosecutor's remarks: "In my view, the

prosecutor's remarks were impermissible because they were inaccurate and misleading in a manner that diminished the jury's sense of responsibility." *Id.*, at 342.

As JUSTICE O'CONNOR supplied the fifth vote in *Caldwell*, and concurred on grounds narrower than those put forth by the plurality, her position is controlling. See *Marks* v. *United States*, 430 U. S. 188, 193 (1977); *Gregg, supra*, at 169, n. 15. Accordingly, we have since read *Caldwell* as "relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden* v. *Wainwright*, 477 U. S. 168, 184, n. 15 (1986). Thus, "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger* v. *Adams*, 489 U. S. 401, 407 (1989); see also *Sawyer* v. *Smith*, 497 U. S. 227, 233 (1990).

Petitioner argues that *Caldwell* controls this case. He contends that the evidence of his prior death sentence impermissibly undermined the sentencing jury's sense of responsibility, in violation of the principle established in *Caldwell*. We disagree. The infirmity identified in *Caldwell* is simply absent in this case: Here, the jury was not affirmatively misled regarding its role in the sentencing process. The evidence at issue was neither false at the time it was admitted, nor did it even pertain to the jury's role in the sentencing process. The trial court's instructions, moreover, emphasized the importance of the jury's role. As the Court of Criminal Appeals observed:

> "The jury was instructed that it had the responsibility for determining whether the death penalty should be imposed. . . . It was never conveyed or intimated in any way, by the court or the attorneys, that the jury could shift its responsibility in sentencing or that its role in any way had been minimized." *Romano II*, 847 P. 2d, at 390.

We do not believe that the admission of evidence regarding petitioner's prior death sentence affirmatively misled the jury regarding its role in the sentencing process so as to diminish its sense of responsibility. The admission of this evidence, therefore, did not contravene the principle established in *Caldwell.*

That this case is different from *Caldwell* only resolves part of petitioner's challenge. In addition to raising a *"Caldwell"* claim, petitioner presents a more general contention: He argues that because the evidence of his prior death sentence was inaccurate and irrelevant, the jury's consideration of it rendered his sentencing proceeding so unreliable that the proceeding violated the Eighth Amendment. See *Lockett* v. *Ohio,* 438 U. S. 586, 604 (1978) (plurality opinion); *Woodson* v. *North Carolina,* 428 U. S. 280, 305 (1976). The Oklahoma court agreed that the "evidence of the imposition of the death penalty by another jury is not relevant in determining the appropriateness of the death sentence for the instant offense." *Romano II, supra,* at 391. That the evidence may have been irrelevant as a matter of state law, however, does not render its admission federal constitutional error. See *Estelle* v. *McGuire,* 502 U. S. 62, 67 (1991).

Some of the cases upon which petitioner relies for support, to be sure, do hold that the Constitution bars the introduction of certain evidence at sentencing proceedings. But these cases are plainly inapposite. Petitioner cites, for example, *Dawson* v. *Delaware,* 503 U. S. 159 (1992). There we held that the trial court erred by admitting evidence, at Dawson's capital sentencing proceeding, regarding Dawson's membership in a white racist prison gang known as the Aryan Brotherhood. See *id.,* at 162–163. It was *constitutional* error, however, only because the admission violated "Dawson's First Amendment rights." *Id.,* at 167. *Dawson* thus involved application of the principle first enunciated in *Zant:* An aggravating circumstance is invalid if "it authorizes a jury to draw adverse inferences from conduct that is

constitutionally protected." 462 U. S., at 885. Petitioner does not argue that the admission of evidence regarding his prior death sentence allowed the jury to consider, in aggravation, constitutionally protected conduct. Accordingly, our decisions in *Dawson* and *Zant* do not support petitioner's contention.

Petitioner also cites *Johnson* v. *Mississippi*, 486 U. S. 578 (1988), but it, too, is inapposite. There we reversed the imposition of Johnson's death sentence because the only evidence supporting an aggravating factor turned out to be invalid, and because the Mississippi Supreme Court refused to reweigh the remaining, untainted aggravating circumstances against the mitigating circumstances. *Id.*, at 586, 590, n. 8. Similarly, in this case the only evidence supporting the "prior violent felony" aggravating circumstance was the judgment from petitioner's conviction for the Thompson murder. That evidence, like the evidence in *Johnson*, was rendered invalid by the reversal of petitioner's conviction on appeal.

Here, however, the Oklahoma Court of Criminal Appeals struck the "prior violent felony" aggravator, reweighed the three untainted aggravating circumstances against the mitigating circumstances, and still concluded that the death penalty was warranted. See *Romano II, supra*, at 389, 393–394. The Court of Criminal Appeals' approach is perfectly consistent with our precedents, including *Johnson*, where we remanded without limiting the Mississippi Supreme Court's authority to reweigh the remaining aggravating circumstances against the mitigating circumstances. See 486 U. S., at 590; *id.*, at 591 (White, J., concurring); see also *Clemons*, 494 U. S., at 744–750. Contrary to petitioner's assertion, *Johnson* does not stand for the proposition that the mere admission of irrelevant and prejudicial evidence requires the overturning of a death sentence.

Petitioner's argument, pared down, seems to be a request that we fashion general evidentiary rules, under the guise of interpreting the Eighth Amendment, which would govern

the admissibility of evidence at capital sentencing proceedings. We have not done so in the past, however, and we will not do so today. The Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings. Cf. *Payne* v. *Tennessee*, 501 U. S. 808, 824–825 (1991); *Blystone*, 494 U. S., at 309.

Petitioner finally argues that the introduction of the evidence in question violated the Due Process Clause of the Fourteenth Amendment. It is settled that this Clause applies to the sentencing phase of capital trials. See, *e. g., Payne, supra,* at 825; *Clemons, supra,* at 746 ("[C]apital sentencing proceedings must of course satisfy the dictates of the Due Process Clause").

We believe the proper analytical framework in which to consider this claim is found in *Donnelly* v. *DeChristoforo*, 416 U. S. 637, 643 (1974). There we addressed a claim that remarks made by the prosecutor during his closing argument were so prejudicial as to violate the defendant's due process rights. We noted that the case was not one in which the State had denied a defendant the benefit of a specific constitutional right, such as the right to counsel, or in which the remarks so prejudiced a specific right as to amount to a denial of that right. *Id.,* at 643. Accordingly, we sought to determine whether the prosecutor's remark "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Ibid.* We concluded, after an "examination of the entire proceedings," that the remarks did not amount to a denial of constitutional due process. *Ibid.*

The relevant question in this case, therefore, is whether the admission of evidence regarding petitioner's prior death sentence so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process. See *Sawyer*, 497 U. S., at 244 (observing that "[t]he *Caldwell* rule was . . . added to [*Donnelly's*] existing guarantee of due process protection against

fundamental unfairness"); see also *Darden*, 477 U. S., at 178–181 (in analyzing allegedly improper comments made by prosecutor during closing argument of guilt-innocence stage of capital trial, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process'" (quoting *Donnelly, supra,* at 643)). Under this standard of review, we agree with the Oklahoma Court of Criminal Appeals that the admission of this evidence did not deprive petitioner of a fair sentencing proceeding.

The evidence that petitioner received a death sentence for murdering Thompson was deemed irrelevant by the Oklahoma Court of Criminal Appeals. See *Romano II*, 847 P. 2d, at 391. However, if the jurors followed the trial court's instructions, which we presume they did, see *Richardson* v. *Marsh*, 481 U. S. 200, 206–207, 211 (1987), this evidence should have had little—if any—effect on their deliberations. Those instructions clearly and properly described the jurors' paramount role in determining petitioner's sentence, and they also explicitly limited the jurors' consideration of aggravating factors to the four which the State sought to prove. Regardless of the evidence as to petitioner's death sentence in the Thompson case, the jury had sufficient evidence to justify its conclusion that these four aggravating circumstances existed. Although one of the aggravating circumstances proved invalid when petitioner's conviction for the Thompson murder was overturned on appeal, the other three remained untainted and still outweighed the mitigating circumstances. See *Romano II, supra,* at 389, 393–394. In short, the instructions did not offer the jurors any means by which to give effect to the evidence of petitioner's sentence in the Thompson murder, and the other relevant evidence presented by the State was sufficient to justify the imposition of the death sentence in this case.

Even assuming that the jury disregarded the trial court's instructions and allowed the evidence of petitioner's prior

death sentence to influence its decision, it is impossible to know how this evidence might have affected the jury. It seems equally plausible that the evidence could have made the jurors more inclined to impose a death sentence, or it could have made them less inclined to do so. Either conclusion necessarily rests upon one's intuition. To hold on the basis of this record that the admission of evidence relating to petitioner's sentence in the Thompson case rendered petitioner's sentencing proceeding for the Sarfaty murder fundamentally unfair would thus be an exercise in speculation, rather than reasoned judgment.

The judgment of the Oklahoma Court of Criminal Appeals is

*Affirmed.*

JUSTICE O'CONNOR, concurring.

The Court today, relying in part on my opinion in *Caldwell* v. *Mississippi*, 472 U. S. 320, 341 (1985), rejects petitioner's claim that the introduction of evidence of a prior death sentence impermissibly undermined the jury's sense of responsibility. I write separately to explain why in my view petitioner's *Caldwell* claim fails. The inaccuracy of the prosecutor's argument in *Caldwell* was essential to my conclusion that the argument was unconstitutional. See *id.*, at 342 ("[T]he prosecutor's remarks were impermissible because they were inaccurate and misleading in a manner that diminished the jury's sense of responsibility"). An accurate description of the jury's role—even one that lessened the jury's sense of responsibility—would have been constitutional. *Ibid.* ("[A] misleading picture of the jury's role is not sanctioned by [*California* v. *Ramos*, 463 U. S. 992 (1983),] [b]ut neither does *Ramos* suggest that the Federal Constitution prohibits the giving of accurate instructions regarding postsentencing procedures").

Accordingly, I believe that petitioner's *Caldwell* claim fails because the evidence here was *accurate* at the time it was

admitted. Petitioner's sentencing jury was told that he had been sentenced to death—and indeed he had been. Introducing that evidence is no different than providing the jury with an accurate description of a State's appellate review process. Both may (though we can never know for sure) lessen the jury's sense of responsibility, but neither is unconstitutional. Though evidence like that involved in this case can rise to the level of a *Caldwell* violation, to do so the evidence must be *both* inaccurate *and* tend to undermine the jury's sense of responsibility. *Ibid.*

It may well have been better practice for the State to agree to accept petitioner's stipulation offer, or to excise the sentencing information before submitting the Judgment and Sentence form to the jury. But under our precedents, because this evidence was accurate, I do not believe its introduction violated the Constitution.

JUSTICE BLACKMUN, dissenting.

I join JUSTICE GINSBURG's dissent, which persuasively demonstrates why the admission of Romano's prior death sentence, like the prosecutor's arguments in *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985), created an unacceptable risk of leading the jurors to minimize the importance of their roles. Even if this particular constitutional error were not present in this case, I would vacate Romano's death sentence and remand for resentencing in adherence to my view that the death penalty cannot be imposed fairly within the constraints of our Constitution. See *Callins* v. *Collins*, 510 U. S. 1141, 1143 (1994).

JUSTICE GINSBURG, with whom JUSTICE BLACKMUN, JUSTICE STEVENS, and JUSTICE SOUTER join, dissenting.

In *Caldwell* v. *Mississippi*, 472 U. S. 320 (1985), this Court overturned a capital sentence as inadequately reliable because of a statement made by the prosecutor, in closing argument at the penalty phase of the trial. The *Caldwell* prose-

cutor told the jury: " '[Y]our [sentencing] decision is not the final decision' "; " 'the decision you render is automatically reviewable by the [State] Supreme Court.' " *Id.*, at 325–326. Responding to the issue presented in *Caldwell*, this Court observed that capital sentencing jurors, required to determine "whether a specific human being should die at the hands of the State," *id.*, at 329, are "placed in a very unfamiliar situation and called on to make a very difficult and uncomfortable choice," *id.*, at 333. Such jurors, the Court noted, might find "highly attractive" the prosecutor's suggestion that persons other than themselves would bear "responsibility for any ultimate determination of death." *Id.*, at 332–333.

The possibility the jury might have embraced the prosecutor's suggestion, the Court concluded, rendered the imposition of the death penalty inconsistent with the Constitution's requirement of individualized and reliable capital sentencing procedures. See *id.*, at 323, 329–330, 340–341. Emphasizing the " 'truly awesome responsibility' " imposed upon capital sentencing juries, *id.*, at 329, quoting *McGautha* v. *California*, 402 U. S. 183, 208 (1971), the Court held:

> "[I]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U. S., at 328–329.

In my view, this principle, reiterated throughout the Court's *Caldwell* opinion,[1] covers the present case: The jury's

---

[1] See 472 U. S., at 323 (sentence constitutionally invalid, because unreliable, if "the sentencing jury is led to believe that responsibility for determining the appropriateness of a death sentence rests not with the jury but with the appellate court which later reviews the case"); *id.*, at 333 ("[T]he uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role."); *id.*, at 341 (because the State's effort "to minimize the jury's sense

consideration of evidence, at the capital sentencing phase of petitioner Romano's trial, that a prior jury had already sentenced Romano to death, infected the jury's life-or-death deliberations as did the prosecutorial comments condemned in *Caldwell*. Accordingly, I would vacate the death sentence imposed upon Romano and remand for a new sentencing hearing.

## I

At the penalty phase of Romano's trial for the murder of Roger Sarfaty, the prosecution sought to put before the jury a copy of the "Judgment and Sentence" from an earlier and unrelated prosecution. That document revealed that Romano had been convicted of the first-degree murder of Lloyd Thompson and that he was to be executed for that crime. Defense counsel offered to stipulate to Romano's conviction for the Thompson murder, but objected to the jury's consideration of the death sentence. The trial court overruled defense counsel's objection and admitted the "Judgment and Sentence" document. That document stated that Romano had given "no good reason why [the] Judgment and Sentence [for the murder of Thompson] should not be pronounced," and commanded the State's Department of Corrections "to put the said JOHN JOSEPH ROMANO to death." App. 6. The jury in the instant, Sarfaty murder case also sentenced Romano to death.

During the pendency of Romano's appeal from his conviction and sentence for the Sarfaty murder, the Oklahoma Court of Criminal Appeals vacated his conviction for the Thompson murder. *Romano* v. *State*, 827 P. 2d 1335 (1992). Romano urged on appeal in the Sarfaty case that, under *Caldwell* v. *Mississippi*, it was impermissible to place before the jury, as relevant to its deliberations whether Romano

---

of responsibility for determining the appropriateness of death" might have affected the sentencing decision, the death sentence must be vacated).

should live or die, evidence that he was already under sentence of death.

The Oklahoma court rejected that contention and affirmed Romano's conviction and death sentence for the Sarfaty murder. 847 P. 2d 368, 390 (Okla. Crim. App. 1993). In so ruling, the court acknowledged that "[l]earning that the defendant had previously received a death sentence for another murder could diminish the jury's sense of importance of its role and mitigate the consequences of [its] decision." *Ibid.* The court further recognized that "evidence of the imposition of the death penalty by another jury is not relevant in determining the appropriateness of the death sentence for the instant offense." *Id.*, at 391. Nevertheless, the court concluded, "when the jury is properly instructed as to its role and responsibility in making such a determination we cannot, on appellate review, conclude that the jur[ors] in any way shifted the responsibility for their decision or considered their decision any less significant than they would otherwise." *Id.*, at 390.[2] That judgment is now before the Court.[3]

## II

In *Caldwell*, this Court found constitutionally impermissible a prosecutor's statement, at the penalty phase of a capital trial, that the jury's decision was "not the final decision" because it was "automatically reviewable." The prosecutor's assurances were impermissible, the Court ruled, because they created an unacceptable risk that the jury would "minimize the importance of its role," "believ[ing] that the responsibility for determining the appropriateness of the defend-

---

[2] The court also observed that, although death sentences attract "heightened" appellate scrutiny, "a presumption of correctness" attends the jury's determination. 847 P. 2d, at 391.

[3] Romano was subsequently reconvicted at his second trial for the Thompson murder and again sentenced to death. See Brief for Petitioner 31, n. 11. The State does not suggest that these events affect the question we consider.

ant's death rest[ed] elsewhere." *Caldwell*, 472 U. S., at 333, 329. This belief, the Court explained, is inconsistent with the "heightened 'need for reliability'" in capital sentencing. *Id.*, at 323, quoting *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (plurality opinion).

The risk of diminished jury responsibility was also grave in Romano's case. Revealing to the jury that Romano was condemned to die for the Thompson murder signaled to the jurors in the Sarfaty murder case that Romano faced execution regardless of their life-or-death decision in the case before them. Jurors so informed might well believe that Romano's fate had been sealed by the previous jury, and thus was not fully their responsibility. See *People* v. *Hope*, 116 Ill. 2d 265, 274, 508 N. E. 2d 202, 206 (1986) ("'[T]he jury's awareness of defendant's prior death sentence would diminish its sense of responsibility . . . . Assuming that defendant was already going to be executed, the jurors may consider their own decision considerably less significant than they otherwise would.'"), quoting *People* v. *Davis*, 97 Ill. 2d 1, 26, 452 N. E. 2d 525, 537 (1983); *West* v. *State*, 463 So. 2d 1048, 1052–1053 (Miss. 1985) ("[I]f the jury knows that the [defendant] is already under a sentence of death it would tend to relieve them of their separate responsibility to make that determination.").

A juror uncertain whether to vote for death or for life might be swayed by the knowledge that "'another jury had previously resolved the identical issue adversely to defendant.'" *Hope*, 116 Ill. 2d, at 274, 508 N. E. 2d, at 206, quoting *Davis*, 97 Ill. 2d, at 26, 452 N. E. 2d, at 537. Such a juror, although "unconvinced that death is the appropriate punishment, . . . might nevertheless wish to 'send a message' of extreme disapproval for the defendant's acts," *Caldwell*, 472 U. S., at 331, reasoning that the defendant was already to be executed in any event. Furthermore, jurors otherwise inclined to hold out for a life sentence might acquiesce in a death penalty they did not truly believe warranted. Cf. *id.*,

at 333 ("[O]ne can easily imagine that in a case in which the jury is divided on the proper sentence, the presence of appellate review could effectively be used as an argument for why those jurors who are reluctant to invoke the death sentence should nevertheless give in.").

Respondent State of Oklahoma correctly observes, however, that evidence of a prior death sentence may not produce a unidirectional bias toward death. Brief for Respondent 23. Some jurors, otherwise inclined to believe the defendant deserved the death penalty for the crime in the case before them, might nonetheless be anxious to avoid any feeling of responsibility for the defendant's execution. Jurors so minded might vote for a life sentence, relying on the prior jury's determination to secure defendant's death. See *ante*, at 14. The offending prosecutorial comments in *Caldwell*, by contrast, created an apparently unidirectional "bias toward a death sentence," for the appellate review that the *Caldwell* jurors were encouraged to consider could occur only if the jury sentenced the defendant to death, not if it voted for life. 472 U. S., at 331–332. Oklahoma maintains that Romano remains outside the *Caldwell* principle, because he is unable to demonstrate that the evidence of his prior death sentence tilted the jurors toward death.

Romano's prosecutor, at least, seems to have believed that informing the jurors of the prior death sentence would incline them toward death, for otherwise, he probably would not have insisted upon introducing the "Judgment and Sentence" itself, over Romano's objection, and despite Romano's offer to stipulate to the underlying conviction. Most critically, *Caldwell*, as I comprehend that decision, does not require Romano to prove that the prosecutor's hunch was correct, either in Romano's case in particular or in death penalty cases generally.

*Caldwell* dominantly concerns the capital sentencing jury's awareness and acceptance of its "'awesome responsibility.'" *Id.*, at 341. To assure that acceptance, this Court's Eighth

Amendment jurisprudence instructs, capital sentencing procedures must be especially reliable. See *id.*, at 323 (prosecutor's comments were "inconsistent with the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case'"), quoting *Woodson* v. *North Carolina*, 428 U. S., at 305; 472 U. S., at 341 (death sentence "does not meet the standard of reliability that the Eighth Amendment requires," when it may have been affected by the State's attempt "to minimize the jury's sense of responsibility for determining the appropriateness of death"). Under *Caldwell's* reasoning, diminution of jurors' sense of responsibility violates the Eighth Amendment's reliability requirement, whether or not a defendant can demonstrate empirically that the effect of this diminution was to bias the jurors' judgment toward death. According to *Caldwell*, if a reviewing court "cannot say" that an effort "to minimize the jury's sense of responsibility for determining the appropriateness of death . . . had no effect on the sentencing decision, . . . [t]he sentence of death must . . . be vacated" as unreliable. *Ibid.*

### III

The Court today reads *Caldwell* to apply only if the jury has been "affirmatively misled regarding its role in the sentencing process." *Ante*, at 9. According to the Court, because no information, incorrect when conveyed, was given to the jury responsible for sentencing Romano for Sarfaty's murder, "[t]he infirmity identified in *Caldwell* is simply absent in this case." *Ibid.*

The Court rests its rendition of *Caldwell* on the premise that only a plurality of the Court's Members endorsed the principle I regard as pivotal: Diminution of the jury's sense of responsibility "preclude[s] the jury from properly performing its [charge] to make an individualized determination of the appropriateness of the death penalty." See *ante*, at 8, citing *Caldwell*, 472 U. S., at 330–331, 341. In fact, however,

key portions of *Caldwell* that the Court attributes to a plurality of four were joined by five of the eight Justices who participated in that case. JUSTICE O'CONNOR parted company with the other Members of the majority only as to a discrete, three-paragraph section, Part IV–A (*id.*, at 335–336), in which "[t]he Court," in her view, "seem[ed] generally to characterize information regarding appellate review as 'wholly irrelevant to the determination of the appropriate sentence.'" *Id.*, at 342 (opinion concurring in part and concurring in judgment), quoting *id.*, at 336. JUSTICE O'CONNOR explained that she did not read *California* v. *Ramos*, 463 U. S. 992 (1983), "to imply that the giving of nonmisleading and accurate information regarding the jury's role in the sentencing scheme is irrelevant to the sentencing decision." 472 U. S., at 341 (emphasis deleted). It was in that context that JUSTICE O'CONNOR stated her view, quoted *ante*, at 8–9, that "'the prosecutor's remarks were impermissible,'" not because they referred to the existence of postsentence review, but "because they were inaccurate and misleading in a manner that diminished the jury's sense of responsibility." 472 U. S., at 342.

JUSTICE O'CONNOR's opinion thus appears to rest on "grounds narrower" than those relied upon by the other Members of the Court's *Caldwell* majority, see *ante*, at 9, only insofar as her concurrence disavowed any implication that the "giving of accurate instructions regarding postsentencing procedures," 472 U. S., at 342, is irrelevant or unconstitutional. The evidence of Romano's death sentence for the murder of Thompson, however, was not information regarding postsentencing procedures Romano might pursue. Nor, as the Oklahoma Court of Criminal Appeals found, was the "Judgment and Sentence" for Thompson's murder relevant to the Sarfaty jury's sentencing decision. 847 P. 2d, at 391 ("evidence of the imposition of the death penalty by another jury is not relevant in determining the appropriateness

of the death sentence for the instant offense").[4]   Accordingly, I do not read JUSTICE O'CONNOR's concurring opinion as narrowing the Court's *Caldwell* holding with respect to the issue this case presents.   Nor, for reasons set out in the margin, do I agree with the Court that several post-*Caldwell* cases, beginning with *Darden* v. *Wainwright,* 477 U. S. 168 (1986), confirm the narrow interpretation of *Caldwell* the Court announces today.   See *ante,* at 9.[5]

Finally, the Court relies, as did the Oklahoma Court of Criminal Appeals, on the trial court's instruction to the jurors that " '[t]he importance and worth of the evidence is for you to decide,' " together with the court's disavowal of any

---

[4] In its merits brief before this Court, but not in its state-court brief or in its brief in opposition to the petition for certiorari, the State of Oklahoma has argued that the evidence of Romano's prior sentence may have been relevant.   This belated argument does not persuade.   The only authority the State cites holding that a prior death sentence may be relevant evidence at sentencing is *Commonwealth* v. *Beasley,* 505 Pa. 279, 288, 479 A. 2d 460, 465 (1984); that case decided, purely as a matter of state statutory construction, that the term "conviction" could be taken to include the sentence imposed for an earlier conviction.

[5] In *Darden,* the Court rejected a *Caldwell* challenge to a prosecutor's comments at the guilt phase of a capital trial.   The Court observed that the fact that the prosecutor did not make these comments at the penalty phase "greatly reduc[ed] the chance that they had any effect at all on sentencing."   477 U. S., at 183–184, n. 15.   Further, unlike the "Judgment and Sentence" form in Romano's case, the comments made in *Darden* were not evidence, and the trial court told the jury so "several times."   Finally, the Court concluded that the prosecutor's comments would have had, "[i]f anything, . . . the tendency to *increase* the jury's perception of its role," not diminish it.   *Ibid.*

The Court also relies upon *Dugger* v. *Adams,* 489 U. S. 401, 407 (1989), and *Sawyer* v. *Smith,* 497 U. S. 227, 233 (1990).   In *Adams,* the Court stated that "the merit of respondent's *Caldwell* claim is irrelevant to our disposition of the case."   489 U. S., at 408, n. 4.   In *Sawyer,* the question the Court considered was not whether a *Caldwell* violation had occurred, but whether "*Caldwell* announced a new rule as defined by *Teague* v. *Lane,* 489 U. S. 288 (1989)," *i. e.,* whether *Caldwell* "was . . . dictated by prior precedent existing at the time the [habeas petitioner's] conviction became final."   497 U. S., at 229, 235.

view as to the appropriate punishment. *Ante,* at 5. The Court quotes the Oklahoma court's conclusion that " '[i]t was never conveyed or intimated in any way, by the court or the attorneys, that the jury could shift its responsibility in sentencing or that its role in any way had been minimized.' " *Ante,* at 9, quoting 847 P. 2d, at 390.

Plainly, the trial court's instruction to consider the evidence cannot resolve the *Caldwell* problem in this case: The "Judgment and Sentence" form, bearing Romano's prior death sentence, was part of the evidence the jury was told to consider. Further, once it is acknowledged that evidence of the prior death sentence "could diminish the jury's sense of importance of its role and mitigate the consequences of [its] decision," 847 P. 2d, at 390, it cannot be said that the court or attorneys did not "conve[y] or intimat[e]" that the jury's role was diminished. The prosecution proffered the death-commanding "Judgment and Sentence" as evidence, and the trial court admitted it—over Romano's objection, and despite his offer to stipulate to the conviction. As discussed *supra,* at 18–21, admission of that evidence risked leading jurors to "minimize the importance of [their] role," "believ[ing] that the responsibility for determining the appropriateness of the defendant's death rest[ed] elsewhere." *Caldwell,* 472 U. S., at 333, 329. This risk was "unacceptable in light of the ease with which [it] could have been minimized." *Turner* v. *Murray,* 476 U. S. 28, 36 (1986) (opinion of White, J.).[6]

---

[6] The State argues that any *Caldwell* problems were resolved, because the "Judgment and Sentence" form stated that Romano "gave notice of his intention to appeal from the Judgment and Sentence herein pronounced," App. 7, and because the trial judge told the jury, when the form was admitted, that "[Romano] has been convicted but it is on appeal and has not become final," Tr. 45 (May 26, 1987). See Brief for Respondent 19–22. I do not find these general references to appellate review sufficient to salvage the instant death sentence, given the irrelevance of Romano's prior sentence to legitimate sentencing considerations, see 847 · P. 2d, at 391, and the ease with which all *Caldwell* difficulty could have been avoided.

## IV

Permitting the jury to consider evidence that Romano was already under sentence of death, while that jury determined whether Romano should live or die, threatened to "minimize the jury's sense of responsibility for determining the appropriateness of death." Unable to say that the jury's consideration of Romano's prior death sentence "had no effect on the [instant] sentencing decision," *Caldwell*, 472 U. S., at 341, I would vacate that decision and remand the case for a new sentencing hearing.