2001 OK CR 27

STATE of Oklahoma, Appellant,

v.

Patsy "Pat" THOMASON, Appellee.

No. SR–2000–859.

Court of Criminal Appeals of Oklahoma.

Oct. 3, 2001.

Rehearing Denied Nov. 5, 2001.

Steven Cravens, Tully McCoy, Assistant Attorneys General, Medicaid Fraud Control Unit, Oklahoma City, OK, Attorneys for the State at trial.

Steven L. Parker, Attorney at Law, Tecumseh, OK, Attorney for Appellee at trial.

Susan C. Stallings, Assistant Attorney General, W.A. Drew Edmondson, Attorney General of Oklahoma, Oklahoma City, OK, Attorneys for the State on appeal.

Steven L. Parker, Attorney at Law, Tecumseh, OK, Attorney for Appellee on appeal.

*OPINION*

STRUBHAR, J.:

¶1 Patsy "Pat" Thomason, Appellee, was charged in a three count Multi-county Grand Jury indictment. The indictment was dismissed and refiled as an Information in the District Court of Comanche County, Case No. CF–99–177, charging Thomason with Count I—Caretaker Neglect (21 O.S.1991, 843.1), Count II—Obstructing an Officer (21 O.S.1991, § 540) and Count III—Attempted Subornation of Perjury (21 O.S.1991, § 504). The magistrate bound Thomason over on the felony counts, Counts I and III. Thomason then filed a motion to dismiss Count I and a motion to quash, set aside and dismiss Count II. After the trial court heard argument and the parties filed supplemental briefs, the court granted Thomason's motions. The State appeals pursuant to 22 O.S.1991, §§ 1053.1 and 1053(3).

¶2 Appellee Thomason was the Regional Director of the Tutera Group, the managing entity of Western Hills Health Care Center (WHHCC), a nursing home in Lawton. The charge of caretaker neglect arose from the care or lack thereof that George Roberts, a 91–year–old resident of WHHCC with dementia of the Alzheimer's type, received from April 9, 1998 through May 9, 1998. Roberts was discovered in his room with a broken leg on April 9. He was transported to the hospital where a full cast was placed on his leg and he was returned to WHHCC later that day. Due to Roberts' incontinence and lack of a catheter, urine got into his cast. Over the next month several employees reported to the charge nurses that the cast was dirty and had a foul odor, but no action was taken. On May 8, 1999, Roberts was having trouble breathing and an ambulance was dispatched. The EMT noticed the strong odor emanating from Roberts' cast. At the hospital, the cast was removed exposing what had become an open fracture with the bone protruding through the skin and pus draining from the open wound. In addition to the open fracture, Roberts was diagnosed with various infections. He died approximately one month later. Whether Thomason participated in the care of Roberts in any manner was contested.

¶ 3 On September 3, 1998, Investigator Michael Dewey from the Medicaid Fraud Control Unit of the Attorney General's Office was at WHHCC to arrange an interview with an employee as part of his investigation into the neglect of Roberts. Dewey went to the office of Delores Thompson, the Director of Nursing, to arrange the interview. While there he saw a picture of the buttocks of a resident with what appeared to him to be a serious decubitus ulcer (bedsore). He asked Thompson if there was a problem with the resident and she told Dewey she could not discuss it. The following day, Dewey was refused access to the photograph, the resident's medical records and the depicted resident.[1] Dewey then obtained a search warrant as authorized by 56 O.S.Supp.1995, § 1003(C)(1). He served the search warrant on LaDonna Jones, an administrator at WHHCC who refused to disclose the name of the resident or produce the photograph. According to Dewey, nothing was provided. It appears from his testimony that he did not search WHHCC even though the search warrant authorized him to do so.

¶ 4 Angie Oliver–McGee, an employee at WHHCC, testified that Thomason gave her a file with the photograph in it and told her "to do something with it" and not to tell LaDonna Jones where it was. McGee understood Thomason to mean that she should hide it so when the investigators from the Attorney General's Office asked LaDonna for it, LaDonna could say she did not know where it was. The identity of the resident and the photograph were turned over later by WHHCC's legal counsel. Additional pertinent facts will be discussed as they become relevant to the propositions raised for review.

¶ 5 The State of Oklahoma asserts the trial court erred in ruling that § 843.1 was unconstitutional as applied to Thomason.[2] The reason the trial court found § 843.1 unconstitutional is not clear from this record. In ruling § 843.1 was unconstitutional as applied to Thomason, the trial court merely

stated, "There is no way that a reasonable person could—I think in her position be on notice of what was expected of her under the law." [3]

¶ 6 Below, Thomason argued that the caretaker neglect statute was void because it referenced a definition for caretaker at 43A O.S.1991, § 803 that had been repealed. *See* 21 O.S.1991, § 843.1. Because the statute defining caretaker had moved, Thomason argued only those trained in legal research could determine the charge against them. At the hearing on her motion to dismiss, Thomason also argued that she, as a management employee, could not have known that she could be criminally responsible for abuse or neglect of nursing home residents given the definition of caretaker and the management exemption from liability found in the rules and regulations governing nursing homes. Thomason also maintained § 843.1 was unconstitutional because it lends itself to selective prosecution.

¶ 7 It is a well established rule of law that a legislative act is presumed to be constitutional and that the party attacking the constitutionality of the statute has the burden of proof. *Romano v. State*, 1993 OK CR 8, ¶ 66, 847 P.2d 368, 384, *aff'd*, 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). "Whenever reasonably possible statutes should be construed so as to uphold their constitutionality." *Id.* A criminal statute is void only when it is so vague that men of common intelligence must necessarily guess at its meaning. *Pratt v. State*, 1982 OK CR 31, ¶ 3, 642 P.2d 268, 269–70. When the foregoing standard is applied to § 843.1, we find the statute is not so vague as to be violative of due process.

¶ 8 At the time of the alleged incident, § 843.1 provided:

A. No caretaker as defined in Section 803 of Title 43A of the Oklahoma Statutes shall willfully abuse, neglect, or financially exploit any person entrusted in his care, or

---

1. Denial of access to the resident is a violation of 42 U.S.C. § 1396r(C)(3)(A) which provides that nursing facilities must permit immediate access to any resident by any representative of the state.

2. Because the court found the caretaker neglect statute unconstitutional as applied to Thomason, the appeal is automatic. 22 O.S.1991, § 1053.1.

3. Hrg.06/22/00 at 7.

shall cause, secure, or permit any of said acts to be done.

B. Any person convicted of violating the provisions of this section shall be guilty of a felony punishable by a fine of not more than Ten Thousand Dollars ($10,000.00), or by imprisonment in the State Penitentiary for not more than ten (10) years, or by both said fine and imprisonment.

21 O.S.1991, § 843.1.

¶ 9 Contrary to Thomason's claim, § 803 was not repealed; rather, §§ 801 through 810 of Title 43A were renumbered as §§ 10–101 through 10–110 of that same title which was reflected at 43A O.S.1991, § 803 and there was never any gap where the term caretaker for purposes of § 843.1 was not defined.[4] Consequently, the applicable definition of caretaker at the time of the alleged incident was located at 43A O.S.Supp.1997, § 10–103(6) which provided:

6. "Caretaker" means a person who has the responsibility for the care of the person or financial management of the resources of the vulnerable adult as a result of a family relationship or who has assumed the responsibility for the care of the vulnerable adult voluntarily, by contract, or as a result of the ties of friendship.

¶ 10 The statute, although drafted in a general nature, clearly proscribes the infliction of abuse or neglect on vulnerable adults by their caretakers. Because it was clear the definitions section had only been renumbered and there was never any gap where the term caretaker for purposes of § 843.1 was not defined, we find the statute provided Thomason adequate notice.

¶ 11 Further, section 843.1 is not unconstitutional because caretaker is defined differently in the rules and regulations governing nursing homes. Just because Thomason was more familiar with the rules and regulations governing nursing homes by virtue of her occupation than with the penal statutes of the state is irrelevant to this analysis as ignorance of a valid law is not a defense. *See Bell v. State,* 1962 OK CR 160, ¶ 18, 381 P.2d 167, 174 (everyone is presumed to know the

law.) The question we must resolve is whether § 843.1 is so vague that people of common intelligence must necessarily guess at its meaning. Section 843.1's language clearly apprises the public of what conduct will be deemed criminally punishable. Section 843.1 with its accompanying reference to the definition of caretaker is a proper legislative enactment aimed at a specific conduct the proscription of which is within the police power of the state. The real question posed by this case is whether sufficient evidence exists to prove caretaker neglect. This record indicates that it is bitterly disputed whether Thomason is a caretaker and if so, whether she had any contact with Roberts. Those are factual issues to be resolved by a jury.

¶ 12 Lastly, section 843.1 is not unconstitutional because it lends itself to selective prosecution. As we stated in *Childress v. State,* 2000 OK CR 10, ¶ 18, 1 P.3d 1006, 1011:

The decision regarding which criminal charge to bring lies within the wide parameters of prosecutorial discretion. Prosecutorial discretion has boundaries. Prosecutions cannot be based upon "unjustifiable standards such as race, religion or other arbitrary classification." It is the defendant's burden to show the State's prosecution of him is based upon discriminatory grounds.

(citations omitted)

¶ 13 Here, Thomason has not shown that she is being prosecuted based on an unjustifiable classification. This record does not reveal who was ultimately charged. The State states in its Reply Brief that 8 people were charged in connection with the neglect of Roberts. *Appellant's Reply Brief* at 4. However, the magistrate noted that others with more direct contact with Roberts had not been charged. Because Thomason has not shown she is being charged based on an impermissible classification and the magistrate found sufficient evidence to bind her over, we find § 843.1 is constitutional and remand this case for trial. *State v. Johnson,*

---

4. Section 843.1 was corrected to reflect this renumbering when it was rewritten for purposes of

Truth In Sentencing in 1997 as reflected in the 1998 supplement.

1992 OK CR 72, ¶ 4, 877 P.2d 1136, 1142–43 (Opn. on rehrg).

¶ 14 In its last three claims, the State asserts the trial court erred in dismissing Thomason's misdemeanor obstruction charge. The State maintains that because WHHCC is a medicaid facility, Thomason was required to give investigators access to all patient records including the records of non-medicaid patients, which in this case was the photograph of a non-medicaid patient's decubitus ulcer, and her refusal to do so constitutes obstruction. Thomason's motion to quash, set aside and dismiss the obstruction charge (Count II) is best characterized as a demurrer to the Information. *See* 22 O.S.1991, § 504. When demurrers to an information are sustained, it bars further prosecution, 22 O.S.1991, § 508, making any appeal of said ruling a reserved question of law under § 1053(3).

¶ 15 In this case, the trial court held that since the resident in the photograph was a non-medicaid/private pay resident, there were no medicaid records to produce, ruling the A.G. is not entitled to a non-medicaid resident's confidential records. In addition, the trial court ruled the identity of the patient could not be disclosed without a court order due to patient confidentiality.[5] The question raised by these rulings is whether the A.G. is entitled to a non-medicaid recipient's medical records and confidential information in investigations of patient abuse.

¶ 16 The question of whether an A.G. investigator is entitled to non-medicaid records in neglect/abuse investigations is not clear from the statutes[6] and no case has directly

addressed this issue.[7] The bulk of the state and federal statutes and few cases in this area talk in terms of white collar fraud investigations and the issuance of grand jury subpoenas for medicaid recipients' records to conduct such fraud investigations.

¶ 17 Like most states, Oklahoma has created a Medicaid Fraud Control Unit to investigate fraud and fiscal abuse. 56 O.S.Supp. 1995, § 1003. The Oklahoma Medicaid Program Integrity Act provides in pertinent part:

A. No potential Medicaid recipient shall be eligible for medical assistance unless such recipient has, in writing, authorized the Oklahoma Health Care Authority and the Attorney General to examine all records maintained as required by the Oklahoma Medicaid Program by the recipient, or of those receiving or having received Medicaid benefits through the recipient, whether the receipt of such benefits would be allowed by the Oklahoma Medicaid Program or not.

. . .

C. The Attorney General shall be allowed access to all records of persons and Medicaid recipients under the Oklahoma Medicaid Program which are held by a provider, for the purpose of investigating whether any person may have committed the crime of Medicaid fraud, or for use or potential use in any legal, administrative, or judicial proceeding. In carrying out the purposes of the Oklahoma Medicaid Program Integrity Act, the Attorney

---

5. Patient confidentiality is provided for in the Nursing Home Care Act which states:

   6. Every resident shall receive respect and privacy in the medical care program of the resident. Case discussion, consultation, examination and treatment shall remain confidential and shall be conducted discreetly. Personal and medical records shall be confidential, and shall include such documentation or information so as to alert a health care provider or an emergency medical care facility of the existence of a directive to physicians or a living will.
   63 O.S.Supp.1996, § 1–1918(B)(6).

6. In defining "records," the Oklahoma Medicaid Program Integrity Act provides records include

the records of non-medicaid goods or services to verify rates or amounts. 56 O.S.Supp.1995, § 1002(10).

7. In *People v. Ekong*, 221 Ill.App.3d 559, 164 Ill.Dec. 25, 582 N.E.2d 233, 234 (1991), the court noted, without discussing, that the medicaid fraud unit seized billing records of medicaid and non-medicaid patients when executing a search warrant to search a physician's office. The issue addressed was whether the physician could assert physician-patient privilege to bar compliance with a subsequent subpoena duces tecum for medicaid patients' files in relation to the grand jury fraud investigation.

General may take possession of records held by a provider by subpoena, in which case copies of those records obtained by the Attorney General which are necessary for the provider to continue doing business shall be supplied to the provider, or the Attorney General may elect to require that the provider supply the Medicaid fraud control unit within the office of the Attorney General with copies of the records.

D. Records obtained or created by the Authority or the Attorney General pursuant to the Oklahoma Medicaid Program Integrity Act shall be classified as confidential information and shall not be subject to the Oklahoma Open Records Act or to outside review or release by any individual except, if authorized by the Attorney General, in relation to legal, administrative, or judicial proceeding.

E. No person holding such records may refuse to provide the Authority or the Attorney General with access to such records on the basis that release would violate any recipient's right of privacy, any recipient's privilege against disclosure or use, or any professional or other privilege or right. The disclosure of patient information as required by the Oklahoma Medicaid Program Integrity Act shall not subject any physician or other health services provider to liability for breach of any confidential relationship between a patient and a provider.

56 O.S.Supp.1995, § 1004.

¶ 18 The Act makes clear that A.G. investigators are entitled to all records of medicaid recipients. The State maintains that subsection C grants them access to records of all patients based on the language granting them "access to all records of persons and medicaid recipients." However, the term "person," for purposes of the Act,

means any Medicaid provider of goods or services or any employee of such provider, whether that provider is an individual, individual medical vendor, firm, corporation,

professional association, partnership, organization, or other legal entity under the Oklahoma Medicaid Program, or any individual, individual medical vendor, firm, corporation, professional association, partnership, organization, other legal entity, or any employee of such who is not a provider under the Oklahoma Medicaid Program but who provides goods or services to a provider under the Oklahoma Medicaid Program for which the provider submits claims to the Oklahoma Medicaid Program or its fiscal agents.

56 O.S.Supp.1995, § 1002(8).

¶ 19 Given the definition of person, § 1004(C) does not furnish the A.G. with authority to seize non-medicaid recipients' confidential records. Be that as it may, the Medicaid Fraud Control Unit is charged with the responsibility of investigating cases of abuse and neglect of residents in facilities that participate in the medicaid program. *See* 42 U.S.C.A. § 1396b(q)(4); 42 C.F.R. § 1007.11(b)(1); 56 O.S.Supp.1995, § 1003(C)(1). The relative legal supremacy of the competing interests of the A.G.'s duty to investigate patient abuse and neglect and a patient's right to privacy have not been considered by this Court.

¶ 20 In *People v. Doe,* 116 Misc.2d 626, 455 N.Y.S.2d 945 (1982), the New York court considered whether a hospital could assert medical privileges to bar compliance with grand jury subpoenas issued in conjunction with an investigation by the medicaid fraud control unit into possible patient mistreatment including the deaths of two elderly patients. One of the challenged subpoenas sought records of all progress notes for all patients in the Intensive Care Unit for a specific time period.[8] In considering the statutory grants of confidentiality/privacy, the court found that such rights are "less than absolute" and "virtually all such privileges contain exceptions within the statutory powers that created them." *Doe,* 455 N.Y.S.2d at 947. The court concluded the relevant statutes established that "a patient's statutory right to medical privacy is subordinate to the right of the State in cases of

---

**8.** The opinion does not state whether all of the     patients were medicaid recipients.

patient abuse or possible crimes committed against them by members of a hospital." *Id.* at 948. The court held that a patient's statutory right to privacy must give way to the powers of the grand jury. *Id.* In rejecting the physician-patient privilege, the court noted it would be senseless to allow a suspected wrongdoer to advance another party's privilege to shield its own actions. *Id.* at 949. The purpose of the privilege is to protect the patient, not to shield the criminal. *Id.* The aim of such a ruling is to advance the welfare of the patient and not assist the wrongdoer. *Id.* When a privilege does not fulfill its legitimate goal, it should not be utilized to bar an investigation for the truth. *Id.*

¶ 21 Though the Oklahoma Medicaid Program Integrity Act does not specifically address the Medicaid Fraud Control Unit's access to non-medicaid records, it does give the A.G. the power to investigate patient abuse and grants the A.G. the power to issue subpoenas and search warrants in connection with such investigations. 56 O.S.Supp.1995, § 1003(C)(1). We must reconcile and attempt to give effect to the statute giving the A.G. these powers and duties with the patient's statutory right of privacy. Here, we find the *Doe* rational instructive. We recognize that patient confidentiality in medical records is very important, but find that a nursing home and its employees should not be allowed to assert patient confidentiality to block access to relevant records in an investigation into possible abuse of a non-medicaid resident when legal process has been issued. It would not make sense to allow a suspected wrongdoer to advance another party's privilege to shield its own actions. Accordingly, we hold that once there is relevant evidence indicating that a patient has been subject to possible abuse or neglect by a care facility receiving medicaid funds and a subpoena or search warrant has been issued, that facility or its employees are not allowed to utilize patient confidentiality to block an investiga-

tion just because the alleged victim is a non-medicaid patient. Only this holding would allow the Medicaid Fraud Control Unit to conduct a full investigation of patient abuse and protect patient confidentiality.[9] Therefore, the Medicaid Fraud Control Unit is entitled to a non-medicaid patient's confidential records under these circumstances.

LUMPKIN, P.J., CONCURS, and JOHNSON, V.P.J., CONCURS.

CHAPEL, J., CONCURS IN PART/DISSENT IN PART, and LILE, J., CONCURS.

CHAPEL, JUDGE, CONCURS IN PART/DISSENTS IN PART:

¶ 1 I concur in the decision and analysis concerning the Obstructing an Officer charge (Count II). However, I dissent to the decision to reverse the trial judge's Order dismissing the Caretaker Neglect charge (Count I). The Opinion's analysis as to the dismissal of Count I proceeds upon the assumption that the trial court found 21 O.S. 1991, § 843 to be unconstitutional. In fact, it appears reasonably certain that the trial judge specifically found the statute to be constitutional, but found it was being unconstitutionally applied against this defendant. The Opinion notes this distinction but proceeds to analyze the statute as if it had been found to be unconstitutional for vagueness.

¶ 2 It seems fairly clear from the Judge's ruling that what he was concerned about was whether someone in the position of this defendant ("There is no way that a reasonable person could—I think in her position be on notice of what was expected of her under the law.") who was an employee of the nursing home could in any event be determined to be a "caretaker" under 43A O.S.Supp.1997, § 10-103(6). That section defines a caretaker as someone who has the responsibility to

---

9. We note there is little, if any, risk of disgrace from release of the patient/resident's records to the A.G. since the A.G. is required to keep those records confidential unless the A.G. authorizes release in relation to a legal, administrative or judicial proceeding. 56 O.S.Supp.1995, § 1004(D). *See also* 42 CFR § 1007.12(f). Moreover, the release of confidential non-medic-

aid records is authorized only when legal process has been issued which means either there has been a judicial finding of probable cause that there is evidence of the commission a crime (search warrant) or the patient/facility will have the opportunity to litigate necessary issues if opposing the subpoena.

care for a vulnerable adult "as a result of a family relationship or who has assumed the responsibility for the care of the vulnerable adult voluntarily, by contract, or as a result of the ties of friendship." The problem the trial judge had, in my opinion, was not that the statute is vague, but rather that it is clear. An employee of a nursing home would not, simply by virtue of their employment, be covered by the statute. Therefore, unless some evidence was presented at the preliminary hearing that there was a familial, volunteer, contractual, or friendship relationship then the statute could not be constitutionally applied to this defendant. The Opinion correctly notes that the issue of whether the defendant was a caretaker is a question for the jury. But before the issue can be presented to the jury the State must establish that a crime has been committed. It cannot do so unless it puts on some evidence of one of the relationships in § 10–103(6). It did not do so in this case.[1]

¶3 This is a horrible case and nursing home abuse is in the news almost every night. These old folks, like children, are among the most vulnerable among us and they need special protection in my opinion. That said, however, I do not think this Court ought to extend criminal liability to lower level nursing home employees. If that is done it ought to be done by the legislature. I agree with the trial judge that the law, while quite constitutional, was being unconstitutionally applied in this case.

¶4 Finally, I think we should carefully consider whether 22 O.S.1991, § 1053.1 is applicable to a ruling that a statute is being unconstitutionally applied to a specific defendant. The Opinion concludes in footnote 2 that it is. The logical problem with that conclusion is that it makes all the rest of § 1053 superfluous since all decisions against the state ultimately involve the unconstitutional application of a statute to a defendant. To me, § 1053.1 applies where a trial judge has ruled a statute unconstitutional. Here, while the argument and the ruling are somewhat muddled, I would conclude that the trial

judge's order in effect sustained a demurrer to the evidence and allow the appeal under § 1053(4).

---

1. The State ought to characterize the defendant as a "volunteer" in the Information and Amended Information. However, the evidence clearly indicated that she was an employee and not a volunteer. A volunteer is someone who gives his or her services without promise of being remunerated.